1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

11

ANTONIO DIAZ,

No.  1:23-cv-01783-KES-SKO (HC)

12

Petitioner,

**FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS**

13

v.

14

RYAN ANDERSON,

**[THIRTY-DAY OBJECTION DEADLINE]**

15

Respondent.

16

17          Petitioner is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus

18    pursuant to 28 U.S.C. § 2254.  He is currently in state prison serving a sentence of 29 years-to-life

19    pursuant to a judgment of the Kern County Superior Court.  As discussed below, the Court finds

20    the petition to be without merit and recommends it be **DENIED.**

21    **I.      PROCEDURAL HISTORY**

22          On May 20, 2021, a Kern County jury found Petitioner guilty of attempted murder (Cal.

23    Penal Code § 182(A)(1)), conspiracy (Cal. Penal Code § 664/187(A)), assault with a deadly

24    weapon (Cal. Penal Code § 245(A)(1)), first degree burglary (Cal. Penal Code § 460(A)), false

25    imprisonment (Cal. Penal Code § 236), and willful cruelty (Cal. Penal Code § 273A(A)).  (Doc.

26    14-3 at 247, 250.[1])  On June 18, 2021, the trial court sentenced Petitioner to a total term of 29

27

28    _____
      [1] Unless otherwise noted, references are to ECF pagination.

1

1    years-to-life.  (Doc. 14-3 at 247, 250.)

2          Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth

3    DCA").  On August 25, 2023, the Fifth DCA affirmed the judgment.  <u>People v. Diaz</u>, 2023 WL

4    5493813 (Cal. Ct. App. 2023).  Petitioner then petitioned for review in the California Supreme

5    Court. (Doc. 14-31.)  On November 1, 2023, the California Supreme Court summarily denied

6    review. (Doc. 14-32.)

7          On December 29, 2023, Petitioner filed a petition for writ of habeas corpus in this Court.

8    (Doc. 1.) Respondent filed an answer on April 10, 2024. (Doc. 15.)  Petitioner did not file a

9    traverse within the allotted time.

10   **II.     FACTUAL BACKGROUND**[2]

11         Petitioner had been involved in a sexual relationship with Wendy M. and lived with both

12   Wendy and her daughter, E.G.,[3] for approximately three years. On October 20, 2019, Wendy

13   decided to break up with Petitioner and asked him to move out of her residence, a converted

14   garage located behind a main residence in Wasco. Wendy decided to terminate her relationship

15   with Petitioner after E.G. played Wendy a recording of Petitioner professing his love to another

16   woman. Unable to reach Petitioner, Wendy contacted his brother, Juan Manual, and instructed

17   him to tell Petitioner to pick up his belongings because she no longer wanted him in her life.

18   Wendy said the same thing to Petitioner when he called her and accused her of being jealous.

19         Thereafter, Wendy arrived home with E.G. and saw Petitioner at the residence with his

20   brothers Mariano Diaz and Lorenzo.[4] Petitioner removed his property from the residence and

21   before he left, he told Wendy that Mariano wanted to kill her but did not because there were too

22   many people who would see it. Wendy told Petitioner she would not get back together with him

23   and she intended to move out of town. Petitioner left after Wendy advised him that she would be

24   going to work later.

25

26   [2] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct.  28 U.S.C. §§
     2254(d)(2), (e)(1).  Therefore, the Court will rely on the Fifth DCA's summary of the facts in <u>Diaz</u>, 2023
     WL 5493813, at *2-4.  <u>See</u> <u>Moses v. Payne</u>, 555 F.3d 742, 746 (9th Cir. 2009).

27   [3] E.G. was born in 2009 and was 11 years old at the time of the trial.

28   [4] Although Wendy testified that Lorenzo and Petitioner were brothers, Petitioner testified that Lorenzo was
     only a friend. Lorenzo's last name does not appear in the appellate record.

1    Wendy and E.G. returned home from Wendy's place of employment at approximately

2    10:30 p.m. Wendy parked at the back of the residence just off the alley after opening the gate she

3    had padlocked to prevent Petitioner from returning. Wendy observed that someone had

4    unsuccessfully attempted to open the gate and was nervous when she and E.G. entered the

5    residence through the back door. The residence was a garage converted into a small studio with

6    the kitchen and dining area near the back door and separated by a curtain from the sleeping area

7    and bathroom, which were near the front door. As Wendy and E.G. entered the bedroom area,

8    Petitioner jumped out of the bathroom and said, "You didn't want to see me?" Wendy had not

9    given Petitioner permission to be in the residence, was frightened, and started to shake.[5] She

10   feared for her safety and the safety of her daughter.

11   Petitioner asked Wendy to get back together with him, but she refused and yelled for E.G.

12   to get off the bed and leave the residence. After E.G. left, Petitioner asked Wendy if she was sure

13   about not reconciling and then pushed her onto the corner of the bed when she repeated she would

14   not reconcile. Petitioner then said, "Action. Kill her."

15   Wendy heard the front door bang, and Mariano and Juan entered and attacked her. Both

16   men were on top of Wendy as she tried to defend herself. Mariano had something shiny that he

17   used to cut her left cheek, jawline, and the left side of her neck and throat. Juan repeatedly struck

18   her stomach and torso in a stabbing motion with an object in his hand. Wendy heard a sound like

19   "blop, blop, blop," realized her neck was bleeding, and believed that they had cut her jugular.

20   Petitioner ran in from the kitchen and said, "Let's go, the police [are] coming." As they ran out,

21   Wendy asked Petitioner for help, but he did not stop.

22   Wendy sustained cuts to her face, lip, chin, left forearm, and neck from Mariano and

23

24   _____

[5] Kern County Sheriff's Deputy David Manriquez testified that he prepared a report documenting that
Wendy heard Petitioner knocking on the front door and allowed him into her residence. Wendy denied that
25   she made that statement. Manriquez recorded his conversation with Wendy while she was being treated by
emergency personnel outside her home, Kern County Sheriff's Deputy Luis Almanza's conversation with
26   Wendy while she was in the ambulance, and Manriquez's second interview of Wendy while she was being
treated at a hospital. Wendy did not mention the manner in which her assailants entered the residence in
27   her first interview and, during the second interview, told Deputy Almanza that Petitioner was inside the
residence. When questioned at the hospital, Wendy told Manriquez that Petitioner frightened her when he
28   emerged from the bathroom into the bedroom upon her return home from work.

seven or eight wounds to her stomach and torso from Juan. Wendy ran to the front of the main residence where her neighbors tried to help stop the bleeding from her neck. One of the neighbors called 911 and reported that Petitioner had stabbed Wendy and she was bleeding. Wendy told the 911 operator, "He stabbed me with a knife," and, "They attacked me in my house." Wendy was transported by ambulance to a helicopter and then to the hospital where she received many stitches that left scars. She testified that she still feels pain in her lips and wakes up screaming from fear that her assailants will return.

Wendy testified that she defended herself but did not have a weapon, threaten her assailants, or try to injure them before the attack. Wendy did not physically engage with Petitioner during their earlier argument either.

A few days after the incident, Wendy realized that Petitioner had left her two voicemails. In the first message, Petitioner attempted to apologize and said, "I should've not done that to you, forgive me." He asked Wendy to contact his sister and promised Wendy a place to live and that she would not have to work anymore. Petitioner promised, that if Wendy wanted him in jail, he would turn himself in to the police but begged her to contact his sister and told her that his family would give Wendy everything she needed. Petitioner also said, "I know that my brother, [Mariano], won't get out anymore, I don't know how many years he'll get but okay, that's my fault. How do you think I feel? My brother is in jail because of me and you're suffering in a hospital ...." Petitioner claimed that he loved Wendy and "did it because of love, because they told me that you were with somebody else, that's why I tried killing you but I reacted."

During his second message, Petitioner said, "I know that I should've not done that to you," "[b]ut please contact my sister. I'll turn myself in if that's what you want, I know I should've not done that to you and forgive me.... But they told me a bunch of things, that's why I was so angry." Petitioner promised to turn himself in to the police but "want[ed] to fix a few things" with Wendy and offered her a "huge amount of money, please." He said, "I know that we're not buying you or anything like that, I know that I'd never buy what I did to you but so that you don't work, I'll offer you some money, I'll see how I can do that."

Wendy testified that in August 2017, Petitioner got on top of her while she was lying

4

1  down and tried to strangle her. Petitioner said he would kill Wendy because he was jealous and
2  did not trust her. After the attack, Wendy had marks on her neck and could not move it. E.G.
3  called 911. Kern County Sheriff's Deputy Matt Constamagna testified that he responded to the
4  incident and that Wendy described that Petitioner choking her and then punching her in the face
5  when she told Petitioner to leave. Constamagna observed swelling and redness in the areas where
6  Wendy been punched and choked.

7         E.G. testified she played Wendy a recording of Petitioner having a conversation with
8  another woman and later saw Petitioner remove his belongings from their residence. When she
9  and Wendy returned home that evening, Petitioner was there and said, "Surprise, mommy." She
10 was scared but left when Wendy told her to leave. E.G. saw Petitioner push Wendy toward the
11 bed and heard them fighting. E.G. went outside and heard Petitioner say, "Action." E.G. lost
12 consciousness when Petitioner grabbed her by the hair and threw her to the ground. When she
13 woke, E.G. yelled for help and looked for her mother in the front yard with the neighbors. E.G.
14 did not see anyone other than Petitioner in the residence during the incident.

15        Petitioner testified that he returned to the residence around noon that day. He called
16 Wendy who as not home at the time. She yelled and insulted him and then sent him a recording of
17 his conversation with another woman. Petitioner then received a call from one of his brothers who
18 conveyed a message from Wendy that he should move out. Petitioner called his brother, Mariano,
19 to assist him. When Wendy returned home, Petitioner went over to her car and begged Wendy to
20 forgive him. She refused, and then Mariano and Lorenzo arrived and drove Petitioner to Juan's
21 house.  According to Petitioner's testimony, later that day, Wendy called him and asked him to
22 return to the residence to pick up his medicine and a ring. During the call, Wendy threatened to kill
23 Petitioner and the woman with whom Wendy believed he was having an affair.

24        Petitioner walked to Wendy's residence, knocked on the door, and entered when Wendy
25 let him inside. He texted Juan to come to the residence because he needed a car to carry additional
26 belongings. Petitioner admitted he was upset that Wendy ended their relationship and was
27 humiliated that she had broken up with him in front of the neighbors earlier that day. Petitioner
28 denied he went to Wendy's that evening to discuss their relationship and only did so at Wendy's

1   request to pick up his belongings.

2          Petitioner testified that he was in the kitchen while Wendy was speaking with Mariano

3   and Juan in the bedroom. He heard Wendy call out and saw Juan and Mariano on top of Wendy

4   on the bed. Petitioner denied that he saw them attacking Wendy and testified that when he entered

5   the room, his brothers immediately ran out and he followed them to find out what had happened.

6   Although Petitioner testified that he intended to defend Wendy, he left the residence without

7   calling for help or helping Wendy. Mariano later told Petitioner that Wendy had nail cutters and

8   intended to hurt Petitioner and that Mariano was defending him. Petitioner testified he did not see

9   Wendy with a weapon and Wendy never did anything physical to either himself or his brothers.

10  Petitioner said he did not hurt Wendy and did not ask his brothers to hurt her.

11         Petitioner testified that he did leave messages for Wendy in which he admitted that he was

12  at fault for trying to kill her but claimed that he only did so because his father instructed him to do

13  so and to protect his brothers.

14  **III.    DISCUSSION**

15         A.    Jurisdiction

16         Relief by way of a petition for writ of habeas corpus extends to a person in custody

17  pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or

18  treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

19  529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as

20  guaranteed by the United States Constitution. The challenged conviction arises out of the Kern

21  County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. §

22  2254(a); 28 U.S.C.§ 2241(d).

23         On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

24  1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

25  enactment. Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases

26  filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA

27  and is therefore governed by its provisions.

28

1   B.  Legal Standard of Review

2    A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless

3 the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision

4 that was contrary to, or involved an unreasonable application of, clearly established Federal law,

5 as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was

6 based on an unreasonable determination of the facts in light of the evidence presented in the State

7 court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);

8 Williams, 529 U.S. at 412-413.

9    A state court decision is "contrary to" clearly established federal law "if it applies a rule

10 that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set

11 of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a

12 different result."  Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-

13 406).

14    In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that

15 an "unreasonable application" of federal law is an objective test that turns on "whether it is

16 possible that fairminded jurists could disagree" that the state court decision meets the standards

17 set forth in the AEDPA.  The Supreme Court has "said time and again that 'an unreasonable

18 application of federal law is different from an incorrect application of federal law.'"  Cullen v.

19 Pinholster, 563 U.S. 170, 203 (2011).  The petitioner "must show far more than that the state

20 court's decision was 'merely wrong' or 'even clear error.'"  Shinn v. Kayer, 592 U.S. 111, 118

21 (2020) (quoting Virginia v. LeBlanc, 582 U. S. 91, 93 (2017) (*per curiam*)).  Rather, a state

22 prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's

23 ruling on the claim being presented in federal court was so lacking in justification that there was

24 an error well understood and comprehended in existing law *beyond any possibility of fairminded*

25 *disagreement*."  Richter, 562 U.S. at 103 (emphasis added); see also Kayer, 592 U.S. at 118.

26 Congress "meant" this standard to be "difficult to meet."  Richter, 562 U.S. at 102.

27    The second prong pertains to state court decisions based on factual findings.  Davis v.

28 Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)).

1    Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the

2    petitioner's claims "resulted in a decision that was based on an unreasonable determination of the

3    facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539

4    U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's

5    factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable

6    among reasonable jurists." Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-

7    1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

8           To determine whether habeas relief is available under § 2254(d), the federal court looks to

9    the last reasoned state court decision as the basis of the state court's decision. See Ylst v.

10   Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir.

11   2004). "[A]lthough we independently review the record, we still defer to the state court's

12   ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

13          The prejudicial impact of any constitutional error is assessed by asking whether the error

14   had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v.

15   Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)

16   (holding that the Brecht standard applies whether or not the state court recognized the error and

17   reviewed it for harmlessness).

18          C.      Review of Petition

19          Petitioner presents his grounds for relief as four distinct claims; however, they are

20   founded on his claim that the trial court failed to properly instruct the jury on reasonable doubt in

21   violation of his due process rights. Specifically, he contends the trial court did not instruct the

22   jury with CALCRIM No. 220, which provides:

23          The fact that a criminal charge has been filed against the defendant[s] is not
            evidence that the charge is true. You must not be biased against the defendant[s]
24          just because (he/she/they) (has/have) been arrested, charged with a crime, or
            brought to trial.
25
            A defendant in a criminal case is presumed to be innocent. This presumption
26          requires that the People prove a defendant guilty beyond a reasonable doubt.
            Whenever I tell you the People must prove something, I mean they must prove it
27          beyond a reasonable doubt [unless I specifically tell you otherwise].

28          Proof beyond a reasonable doubt is proof that leaves you with an abiding

                                                    8

1    conviction that the charge is true. The evidence need not eliminate all possible
     doubt because everything in life is open to some possible or imaginary doubt.
2
     In deciding whether the People have proved their case beyond a reasonable doubt,
3    you must impartially compare and consider all the evidence that was received
     throughout the entire trial. Unless the evidence proves the defendant[s] guilty
4    beyond a reasonable doubt, (he/she/they) (is/are) entitled to an acquittal and you
     must find (him/her/them) not guilty.
5

6    Judicial Council Of California Criminal Jury Instruction 220.  Petitioner contends that by failing

7    to do so, the jury was allowed to apply an incorrect standard to some or all of the charges.

8         The claim[6] was raised on direct review in the state courts.  In the last reasoned decision,

9    the Fifth DCA determined that the trial court erred, but the error was harmless, as follows:

10        **A. Background**

11             *1.  Jury selection.*

12   At the commencement of jury selection, the trial court reviewed hardship requests
     for four groups of prospective jurors on May 4 and 5, 2021. The trial court directed
13   those prospective jurors that had not been excused to return on May 6 and 10,
     2021.
14
     On May 6, 2021, the trial court addressed the first group of prospective jurors and
15   instructed them as follows: "The burden of proof in this criminal case, just like all
     criminal cases, is beyond a reasonable doubt. The only side that has the burden of
16   proof is the prosecutor .... [¶] So [the prosecutor], in order to get a guilty verdict
     received from you, must prove each charge beyond a reasonable doubt. The
17   defendants and the defense attorneys don't have to prove anything. Each defendant
     is presumed to be innocent."
18
     The trial court read and explained CALCRIM No. 103 as follows: "I'm actually
19   going to read to all of you one jury instruction. You'll hear many of these later on
     in the trial, but this instruction is the instruction on the burden of proof. And it's
20   important that I read that to you now. [¶] I will now explain the presumption of
     innocence and the People's burden of proof.... [¶] ... [¶] A defendant in a criminal
21   case is presumed to be innocent. This presumption requires that the People prove a
     defendant guilty a reasonable doubt. Whenever I tell you the People must
22   prove something, I mean they must prove it beyond a reasonable doubt unless I
     specifically tell you otherwise. [¶] Proof beyond a reasonable doubt is proof that
23   leaves you with an abiding conviction that the charge is true. The evidence need
     not eliminate all possible doubt because everything in life is open to some possible
24   or imaginary doubt.... [¶] ... [¶] So it's proof beyond a reasonable doubt, which is
     proof that leaves you with an abiding, long-lasting conviction that the charge is
25   true. The evidence need not eliminate all possible doubt because everything in life
     is open to some possible or imaginary doubt. That's the definition of the burden of
26   proof. [¶] It's not anything different than that. It's not beyond a shadow of a doubt.

27   _____

     [6] Although Petitioner presents his claim as four distinct claims, they were addressed as one claim by the
28   appellate court.

                                            9

It's not preponderance of the evidence. It's not, well, I think they're guilty. It's not I think they're not guilty. It's exactly what I read to you. Don't worry. You don't have to have it memorized. [¶] Everyone will have their own set of jury instructions in the jury room, and you can always ask questions. So that's the burden of proof."

During questioning of the first group of prospective jurors, defense counsel reiterated that the prosecutor had to prove every element of each crime beyond a reasonable doubt and received assurances from the prospective jurors that they would hold their ground if they did not believe that the evidence rose to the level of beyond a reasonable doubt. The prosecutor also discussed his burden of proving the charges beyond a reasonable and requested assurances from the prospective jurors to abide by that standard.

After the parties exercised some of their challenges, the first group of prospective jurors were joined by a second group of prospective jurors later that afternoon. The trial court then instructed both groups of prospective jurors: "In this criminal case, in every criminal case, there's a burden of proof. That proof is beyond a reasonable doubt. There's only one side that has that burden. That is the prosecutor." The trial court continued: "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People to prove a defendant guilty beyond a reasonable doubt. [¶] Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise. Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. [¶] The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.... [¶] Unless the evidence proves a defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty. So it's proof beyond a reasonable doubt, which is proof that leaves you with an abiding, long-lasting conviction that the charge is true. [¶] The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. That's the burden of proof. It's not beyond all shadow of a doubt. It's not preponderance of evidence, or I think they're guilty. That's the burden."

The trial court also explained that each juror should listen to the evidence and decide if the charges were proven beyond a reasonable doubt. To do so, the trial court would give the jury the law and each juror would have a set of the jury instructions during deliberations. The trial court explained, "So you take the law. You compare it to the evidence or the facts, and then you see are the charges proven beyond a reasonable doubt ...." "Your job is not to decide if a defendant is a nice person or a bad person, or not a nice person. It's are they proven to have committed the crime beyond a reasonable doubt or not."

Jury selection resumed on May 10, 2021. During questioning, defense counsel discussed the reasonable doubt standard and the trial court defined reasonable doubt to the prospective jurors as requiring an abiding or long-lasting conviction. Defense counsel advised the prospective jurors that reasonable doubt is the highest burden of proof in the justice system and discussed its meaning with the jury a second time. Defense counsel mentioned the burden of proof more than seven times during questioning. The prosecutor also discussed his burden to prove the charges beyond a reasonable doubt.

After the parties exercised their challenges, the trial court swore in the prospective jurors and alternates. The trial court advised the alternates that they had the same responsibilities and obligations as the other 12 jurors and that all the instructions

provided applied to them as well.

### 2. Jury instructions prior to close of evidence.

When trial resumed on May 12, 2021, the trial court instructed the jury before opening statements. The trial court explained the purpose of opening statements and that they would be followed by the prosecution's presentation of the evidence (CALCRIM No. 100 [Trial Process]). In discussing the possibility that the defense might also present evidence, the trial court instructed that the defense was not required to present any evidence "[b]ecause each defendant is presumed innocent, each defendant does not have to prove they're not guilty." The trial court advised the jury, "I have already explained to you the burden of proof and read that to you."

The prosecutor concluded his opening statement by expressing confidence that at the end of the trial, the jury would find defendants guilty of the charges beyond a reasonable doubt. Mariano's defense counsel advised the jury that the evidence would not be sufficient to convince the jury beyond a reasonable doubt that Mariano was even involved in the offenses. Defendant's counsel told the jury that the prosecution had to prove beyond a reasonable doubt that defendant's specific intent was premeditated in order to convict him of conspiracy to commit murder. Counsel asked the jury to conclude that the circumstantial evidence of defendant's intent was not sufficient to convict him of premeditated murder.

Prior to the presentation of defendant's prior act of domestic violence on May 13, 2021, the trial court explained that the evidence was "for a limited purpose" and stated, "I'm not going to read that instruction to you right now because it's quite lengthy, and I haven't talked to the attorneys about it yet. But it is an important instruction that limits [the evidence] in a certain way and does have a different burden of proof than beyond a reasonable doubt as to whether that prior incident occurred or not. [¶] That does not change the burden of proof that the district attorney must prove each charge beyond a reasonable doubt."

### 3. Predeliberation jury instructions.

The parties and trial court conducted an instruction conference in chambers, which the trial court later memorialized on the record. The trial court noted that it had read several instructions, including CALCRIM No. 103, regarding reasonable doubt. The court then recited the instructions that it intended to read as result of its conferring with counsel and did not include CALCRIM No. 220, also regarding reasonable doubt. The parties indicated their agreement. The trial court e-mailed a copy of the jury instructions to all counsel and ascertained that the parties had no objections.

The trial court instructed the jury prior to closing arguments on the morning of May 19, 2021. The court informed the jury that each juror would have their own set of instructions in the jury room. [Fn.6] The trial court prefaced its final instructions with, "I will now instruct you on the rest of the law that may apply to this case." The trial court did not reinstruct the jury on reasonable doubt pursuant to CALCRIM No. 220. However, CALCRIM No. 103 was included in the packet of written instructions provided to the jurors, and the trial court advised that each juror would have a set of the instructions in the jury room. In addition, several of the court's instructions did reference the reasonable doubt standard in the context of explaining general principles.

11

[Fn.6] Defendant suggests that the written instructions may not have been provided to the jury. However, on May 20, 2021, the foreperson sent a written note to the court and requested a transcription of the prosecutor's remarks concerning "[CALCRIM No.] 1300. Criminal Threat," and also asked whether the jurors "have to find that all of the points 1–6 are true? Page 66." Page 67 of the written jury instructions contains CALCRIM No. 1300, which sets forth six elements for the crime "criminal threat," confirming that the jury had a written set of instructions.

When instructing regarding circumstantial evidence and the sufficiency of evidence (CALCRIM No. 224), the trial court stated, "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt." In explaining eyewitness testimony (CALCRIM No. 315), the trial court instructed the jury that "[t]he People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty."

In explaining to the jury a defendant's right not to testify (CALCRIM No. 355), the trial court instructed that a defendant can "rely on the state of the evidence and argue that the People have failed to prove the charges beyond a reasonable doubt." Additionally, while explaining the corpus delicti rule (CALCRIM No. 359), the trial court indicated, "You may not convict a defendant unless the People have proved a defendant's guilt beyond a reasonable doubt." In instructing the jury as to defendant's failure to explain or deny adverse testimony (CALCRIM No. 361), the trial court stated, "You may not convict a defendant unless the People have proved a defendant's guilt beyond a reasonable doubt.... [¶] Any such failure [to explain evidence] is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt." Addressing the use of coconspirator's statements (CALCRIM No. 418), the trial court explained that the jury could not rely upon a coconspirator's statement unless the People proved certain facts by a preponderance of the evidence and that it is "a different standard of proof than proof beyond a reasonable doubt."

The trial court also instructed the jury on the substantive elements of each of the charged offenses, and those instructions informed the jury the prosecutor carried the burden to prove the elements of the offenses. [Fn.7] Specifically regarding the conspiracy charge, the trial court instructed that all jurors must agree that "it is proven beyond a reasonable doubt that a defendant conspired to commit first degree murder." Additionally, the trial court explained to the jury that the People had (1) "the burden of proving beyond a reasonable doubt that [defendant] did not withdraw from the conspiracy" (CALCRIM No. 420), (2) "the burden of proving beyond a reasonable doubt that the attempted killing was not justified" (CALCRIM No. 505), (3) "the burden of proving beyond a reasonable doubt that the killing—and you understand the conspiracy to kill—was first degree murder rather than a lesser crime" (CALCRIM No. 521), (4) "the burden of proving [the first degree murder allegation] beyond a reasonable doubt" (CALCRIM No. 601), (5) "the burden of proving beyond a reasonable doubt that the defendant attempted to kill someone and was not acting as a result of a sudden quarrel or in the heat of passion" (CALCRIM No. 603), (6) "the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense" (CALCRIM No. 604), (7) "the burden of proving each allegation [that another person, other than an accomplice was present during the burglary] beyond a reasonable doubt" (CALCRIM No. 3250), and (8) "the burden of proving beyond a reasonable doubt

that the burglary was first degree rather than a lesser crime" (CALCRIM No. 1701). As to Mariano, the trial court also instructed the jury that the People must prove the allegations of personal use of a weapon and personal infliction of great bodily injury (CALCRIM Nos. 3185, 3160) beyond a reasonable doubt.

> [Fn.7] The trial court instructed the jury of the elements of conspiracy (CALCRIM Nos. 415, 417), murder (CALCRIM Nos. 520, 521), conspiracy to commit murder (CALCRIM No. 563), attempted murder (CALCRIM No. 600), child abuse (CALCRIM Nos. 821, 823), assault with a deadly weapon (CALCRIM No. 875), simple assault (CALCRIM No. 915), felony false imprisonment (CALCRIM No. 1240), criminal threat (CALCRIM No. 1300), and burglary (CALCRIM No. 1700).

Additionally, the trial court instructed the jury regarding evidence of uncharged acts of domestic violence (CALCRIM No. 852A) and explained that the People must prove that the uncharged domestic violence took place by a preponderance of the evidence, "a different burden of proof from proof beyond a reasonable doubt," but that "[t]he People must still prove each charge and allegation beyond a reasonable doubt."

After closing arguments on May 19, 2021, the court instructed the jury pursuant to CALCRIM No. 3517, which explained how to fill out the verdict forms in light of lesser included offenses for the crimes of attempted murder, assault with a deadly weapon, and child abuse. That instruction advised the jury to fill out the verdict form for the greater offense if convinced that the prosecution had proven defendant guilty and, if not, that it could find defendant guilty of a lesser offense if "convinced beyond a reasonable doubt that the defendant is guilty of that lesser crime." The court further reminded the jury, "As always, whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise."

### 4. Closing arguments.

The prosecutor argued to the jury regarding each element of conspiracy to commit murder and that each element had been proven beyond a reasonable doubt. The prosecutor further argued that he had proven the elements of attempted murder, proven defendant did not act in self-defense, and consequently had proven defendant committed attempted murder beyond a reasonable doubt. The prosecutor similarly referred to the burden of proof in arguing that he had proven Mariano's enhancements beyond a reasonable doubt. He discussed the evidence and charges by repeatedly arguing that he had proven each of the elements for each of the charges beyond a reasonable doubt for each count.

Mariano's defense counsel reminded the jury approximately three times that it had to believe beyond a reasonable doubt what transpired that evening, and that the prosecutor would have a chance to argue again because the prosecutor had the burden to prove beyond all reasonable doubt what happened that evening. Defendant's counsel argued that the jury had to determine whether the evidence proved defendant's guilt beyond a reasonable doubt and that the jury should hold the prosecutor to his burden of proving defendant's guilt beyond a reasonable doubt. Counsel specifically argued that the circumstantial evidence was insufficient to prove that defendant specifically intended to kill Wendy beyond a reasonable doubt. Counsel also explained the definition of reasonable doubt, differentiating between the other standards of proof used in court, and concluded, "It is an abiding conviction. In other words, there is no doubt in your mind what

13

1

2

3

took place on October 20, 2019 is that [defendant], in fact, engaged in all or some of those counts that the Government is alleging." The prosecutor argued in rebuttal, "It's proof beyond a reasonable doubt. It's not proof beyond all possible or imaginary doubt. It's proof beyond a reasonable doubt."

4

5

6

7

During deliberations, the jury sent a note to the trial court that requested a portion of the prosecutor's closing argument discussing "1300," a reference to CALCRIM No. 1300, and also asked, "Do we have to find that all of the points 1–6 are true? Page 66." The elements of criminal threat, CALCRIM No. 1300, are on page 67 of the written jury instructions and lists six elements. The trial court responded, "In order to find guilt as to count 6, criminal threat, all six (6) requirements must be proven beyond a reasonable doubt." (Some capitalization omitted.)

8

### B. Applicable Law and Standard of Review

9

10

11

12

13

14

Defendant argues that the trial court's failure to instruct the jurors on reasonable doubt (CALCRIM No. 220) just before deliberations violated his federal and state rights to due process and a fair trial. "State law and the federal Constitution require the trial court to instruct [that the prosecution must prove all elements of an offense beyond a reasonable doubt] when it advises the jurors of the applicable rules of law that govern their deliberation and decision. In California, a trial court ordinarily satisfies this obligation by instructing the jury under one of two 'pattern' or 'standard' reasonable doubt instructions. (See CALCRIM No. 220, CALJIC No. 2.90 ....)" (*People v. Aranda* (2012) 55 Cal.4th 342, 349 (*Aranda*).) However, a trial court's failure to give the standard reasonable doubt instruction does not necessarily constitute error if its substance is covered in other instructions given by the court. (*Id.* at pp. 354, 358.)

15

16

17

18

19

20

21

22

While a trial court's failure to explain to jurors in predeliberation instructions that the defendant could not be convicted unless the prosecution proved the elements of that crime beyond a reasonable doubt constitutes error under both state law and the federal Constitution, the instructional error under federal law is amenable to harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18. (*Aranda, supra*, 55 Cal.4th at p. 350.) "[A] reviewing court applying the *Chapman* standard to determine the prejudicial effect of the erroneous omission of the standard reasonable doubt instruction should evaluate the record as a whole—but not rely upon its view of the overwhelming weight of the evidence supporting the verdict—to assess how the trial court's failure to satisfy its constitutional obligation to instruct on the prosecution's burden of proof beyond a reasonable doubt affected the jury's determination of guilt. If it can be said beyond a reasonable doubt that the jury must have found the defendant's guilt beyond a reasonable doubt, the error is harmless. If the reviewing court cannot draw this conclusion, reversal is required." (*Id.* at p. 368.)

23

24

25

26

27

The failure to define the term "reasonable doubt," however, does not amount to federal constitutional error, although the omission of a definition of reasonable doubt does constitute an error under state law. (See *Aranda, supra*, 55 Cal.4th at p. 374, fn. 14 [recognizing that both CALCRIM No. 220 and CALJIC No. 2.90 define beyond a reasonable doubt in terms of an abiding conviction that the charge is true].) Such a state law error is subject to harmless error review under the standard in *People v. Watson* (1956) 46 Cal.2d 818, 837, which asks whether there are "reasonable probabilities" that a result more favorable to the defendant would have occurred absent the error. (*Ibid.*)

28

14

**C. Analysis**

> 1. *Other instructions adequately described the prosecution's burden to prove the offenses beyond a reasonable doubt.*

Defendant argues that the trial court's failure to instruct the jurors on reasonable doubt with CALCRIM No. 220 just before deliberations violated his federal and state rights to due process and a fair trial. However, we conclude that this case is controlled by our Supreme Court's decision in *Aranda, supra*, 55 Cal.4th 342 (reviewing the comparable CALJIC instructions), and the omission of CALCRIM No. 220 from the predeliberation instructions did not constitute federal constitutional error as to defendant's convictions.

In *Aranda*, the trial court failed to include a standard reasonable doubt instruction in its predeliberation instructions to the jury, but other instructions (relating to the murder charge) referred to the prosecution's burden of proving the defendant's guilt beyond a reasonable doubt and, therefore, our Supreme Court concluded that at least as to the voluntary manslaughter conviction, "the omission of the standard reasonable doubt instruction did not violate federal due process principles as to [the] defendant's conviction of voluntary manslaughter." (*Aranda, supra*, 55 Cal.4th at p. 358.) As in the instant case, [Fn.8] the instructions given by the *Aranda* trial court referred to the prosecution's burden of proving the defendant's guilt beyond a reasonable doubt, such as the instructions concerning the evaluation of circumstantial evidence, the murder charge, the murder charge's lesser included offenses, self-defense, justification, and the sentence enhancement allegations associated with that count. (*Id*. at pp. 351, 359–360.)

> [Fn.8] The trial court in this case used the CALCRIM versions of the instructions, which similarly referenced the burden of proof being beyond a reasonable doubt.

In this case, in addition to the instructions given in *Aranda*, the trial court also used the comparable CALCRIM instructions and discussed the reasonable doubt standard when explaining the distinction between murder and manslaughter, determining the degree of murder and choosing between murder and the lesser included offense of manslaughter also referred to the requisite standard of proof. Our Supreme Court noted that the various references to the standard of proof in the CALJIC version of the instructions "'related to the murder charge itself and directly informed the jury that, to convict [the defendant] of murder, it had to find each and every element of that charge beyond a reasonable doubt.'" (*Aranda, supra*, 55 Cal.4th at p. 360, quoting with approval *People v. Mayo* (2006) 140 Cal.App.4th 535, 547.) As in *Aranda*, "[w]e conclude that in light of these other instructions[,] the omission of the standard instruction on the prosecutor's burden of proving guilt beyond a reasonable doubt did not amount to federal constitutional error with regard to defendant's conviction of [attempted murder]." (*Aranda*, at p. 361.)

However, the *Aranda* court did find a federal constitutional violation relating to the omission of the standard reasonable doubt instruction as affecting the gang offense because "neither the instruction on the elements of that offense nor any other instruction given by the court connected the reasonable doubt standard of proof to that charge." (*Aranda, supra*, 55 Cal.4th at p. 361.) Defendant argues that, in light of *Aranda* (whose correctness defendant questions), his argument encompasses all counts other than attempted murder (count 1). However, the trial court's instructions on conspiracy included an instruction that the jurors must agree

that "it is proven beyond a reasonable doubt that a defendant conspired to commit first degree murder" (CALCRIM No. 521). Additionally, the trial court explained to the jury that the People had (1) "the burden of proving beyond a reasonable doubt that [defendant] did not withdraw from the conspiracy" (CALCRIM No. 420), (2) "the burden of proving beyond a reasonable doubt that the killing—and you understand the conspiracy to kill—was first degree murder rather than a lesser crime" (CALCRIM No. 521), and (3) "the burden of proving [the first degree murder allegation] beyond a reasonable doubt" (CALCRIM No. 601). As to the burglary charge, the trial court advised the jury that the prosecution had "the burden of proving beyond a reasonable doubt that the burglary was first degree rather than a lesser crime" (CALCRIM No. 1701). Therefore, we conclude that there was no error as to the conspiracy to commit murder and burglary convictions.

As in *Aranda*, the trial court in the this case read the CALCRIM versions of instructions pertaining to the elements of child abuse (CALCRIM Nos. 821, 823), assault with a deadly weapon (CALCRIM No. 875), simple assault (CALCRIM No. 915), felony false imprisonment (CALCRIM No. 1240), and burglary (CALCRIM No. 1700), which advised the jury that the prosecution had the burden of proving each element but did not explain that they must be proved beyond a reasonable doubt. (See *Aranda, supra*, 55 Cal.4th at p. 361.) Our Supreme Court recognized that the gang enhancement allegation set forth the burden of proof, but it did not mention the burden of proof for the substantive gang offense and that the circumstantial evidence instruction's reference to the burden of proof was inadequate where the case depended largely on direct evidence. (*Ibid.*)

However, unlike *Aranda*, the trial court here instructed the jury as to their deliberations and the verdict form (CALCRIM No. 3517) that for attempted murder, assault with a deadly weapon, and child abuse, the jury must follow directions which included completing the verdict form for the greater offense if each juror agreed that the prosecutor had proven defendant guilty of the greater offense and further explained that "whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise." Therefore, "[w]e conclude that in light of these other instructions the omission of the standard instruction on the prosecutor's burden of proving guilt beyond a reasonable doubt did not amount to federal constitutional error with regard to defendant's conviction[s] of [assault with a deadly weapon and child abuse charges]." (*Aranda, supra*, 55 Cal.4th at p. 361.)

As to the false imprisonment charge, we find two instructions significant to our conclusion that there was no error. In explaining eyewitness testimony (CALCRIM No. 315), the trial court instructed the jury that "[t]he People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty." In explaining to the jury a defendant's right not to testify (CALCRIM No. 355), the trial court instructed that a defendant can "rely on the state of the evidence and argue that the People have failed to prove the charges beyond a reasonable doubt."

Therefore, we conclude that the trial court's omission of the standard reasonable doubt instruction did not deprive defendant of his federal or state constitutional right to due process because the trial court's instructions otherwise covered the requirement that the prosecution prove defendant guilty of these offenses beyond a reasonable doubt.

> ### *2. Even if the trial court erred in its instructions to the jury as to the burden of proof, the error was harmless beyond a reasonable doubt.*

Even if the trial court erred, we find any such error harmless under the *Chapman* standard used to determine the prejudicial effect of the erroneous omission of the standard reasonable doubt instruction and, after evaluating the record as a whole (except we have not looked at whether the overwhelming weight of the evidence supports the verdict), we can conclude beyond a reasonable doubt that the jury must have found defendant's guilt beyond a reasonable doubt. (See *Aranda, supra*, 55 Cal.4th at p. 368, applying *People v. Chapman, supra*, 386 U.S. at p. 24.)

As in *Aranda*, we conclude that there is no reasonable possibility that the jury failed to apply the reasonable doubt standard as to any of the charges when it found defendant guilty. (See *Aranda, supra*, 55 Cal.4th at p. 368.) First, the instructions relating to the attempted murder and conspiracy to commit murder counts included the prosecutor's burden to prove the offenses beyond a reasonable doubt. Additionally, the first degree burglary, witness, and corpus delicti instructions (among others) all imposed this burden of proof on the prosecution. In *Aranda*, our Supreme Court concluded that the instructions, as well as the sentencing enhancement instructions which included that burden of proof, amply conveyed the appropriate standard for those offenses and found it unrealistic that the jurors would have believed that a lesser burden of proof applied to the remaining offenses. (*Id*. at p. 369.) Unlike *Aranda*, the trial court here did instruct the jury on a different burden of proof regarding evidence of prior domestic violence and using coconspirator statements (CALCRIM No. 418), but its instructions were clear to differentiate when that standard applied, and the domestic violence instruction (CALCRIM No. 852A) cautioned that "[t]he People must still prove each charge and allegation beyond a reasonable doubt." Additionally, other instructions reinforced that the burden of proof as to all charges was beyond a reasonable doubt, such as explaining that a defendant does not have to testify and can argue that the prosecutor failed to prove the charges beyond a reasonable doubt (CALCRIM No. 355), defendant's statement alone cannot be used to prove guilt and the prosecutor must still prove defendant's guilt beyond a reasonable doubt (CALCRIM No. 359), and a defendant's failure to explain adverse evidence when testifying is not enough to prove guilt and the prosecutor must still prove the defendant guilty beyond a reasonable doubt (CALCRIM No. 361).

We find " 'the most logical response by the jury to the absence of instruction specifically linking the reasonable doubt standard to the [other] count[s] would have been to conclude that a guilty verdict on [those] charge[s] was subject to the same reasonable doubt standard that had been described in the court's instructions on murder, the lesser offenses, and the sentencing allegations." [Fn.9] (*Aranda, supra*, 55 Cal.4th at p. 370.)

> [Fn.9] *Aranda* distinguished *People v. Vann* (1974) 12 Cal.3d 220, 227 (a case cited by defendant) because in that case, the trial court's instructions did not include references to the burden of proof in reference to any substantive offense (unlike the murder instructions) and referred to it only regarding evidence and procedural issues. (*Aranda, supra*, 55 Cal.4th at p. 370.)

Additionally, defendant and Mariano's attorneys emphasized the burden of proof, and the prosecutor used the term "beyond a reasonable doubt" in arguing that he had proven each offense and each element of the offenses. "[N]othing in counsel's

arguments would have misled the jury to believe it should adjudge defendant's guilt of the [other] count[s] under a standard of proof less than beyond a reasonable doubt." (*Aranda, supra*, 55 Cal.4th at p. 370.)

Our Supreme Court in *Aranda* also considered the trial court's instructions to the jury during the selection process as support for the conclusion that there is no reasonable possibility that the jury's verdict was not based on a finding of guilt beyond a reasonable doubt. (*Aranda, supra*, 55 Cal.4th at p. 376 [trial court's instructions and remarks during jury selection cannot relieve the court of its obligation to properly instruct the jury during trial regarding the prosecution's burden of proving defendant's guilt beyond a reasonable doubt, but statements made by the court during jury selection may be considered in determining whether the court's error should properly be found harmless].) In its introductory comments, *Aranda*'s trial court read to the prospective jurors the standard reasonable doubt instruction (CALJIC No. 2.90) and continued to reference the standard throughout jury selection. (*Aranda*, at p. 371.)

Here the trial court also read the standard reasonable doubt instruction (CALCRIM No. 103) to the first prospective jury panel and then to the second panel in the presence of the remaining prospective jurors from the first panel. As to the first panel, the trial court commented, "I'm actually going to read to all of you one jury instruction. You'll hear many of these later on in the trial, but this instruction is the instruction on the burden of proof. And it's important that I read that to you now." The trial court also assured the jury that each juror would have their own set of instructions containing the reasonable doubt instruction, thus indicating that the standard would apply throughout the trial. In addressing the second panel and remaining prospective jurors from the first panel, the trial court explained that as jurors, they would listen to the evidence and decide if the charges were proven beyond a reasonable doubt. The trial court told the jury that it would give them the law, each juror would have a set of jury instructions during deliberations, and the jurors would compare the evidence to the law and determine if "the charges [were] proven beyond a reasonable doubt." Although the trial court did not question each juror as to their understanding of reasonable doubt, counsel for defendants did question the jurors on the burden of proof, and the trial court did repeat the definition of reasonable doubt at the request of counsel.

The *Aranda* court also noted that none of the predeliberation instructions conflicted with, or prevented the jury from relying on, the trial court's repeated and detailed explanation during jury selection that the prosecution must prove every element of each offense beyond a reasonable doubt. (*Aranda, supra*, 55 Cal.4th at p. 373 [distinguishing *People v. Vann, supra*, 12 Cal.3d 220 because trial court's final instructions to jury informed jury that final instructions represented the entirety of the instructions that jury could use to decide the case].) In addition to the trial court's reading of the standard reasonable doubt instruction during selection, the trial court swore in the alternate jurors in the presence of the jury and advised the alternates that all instructions applied to them as well, thereby affirming for both the jurors and the alternate jurors that the court's instructions during jury selection applied throughout the trial.

During its initial instructions to the jury after being impaneled, the trial court advised the jury that it had already explained the burden of proof, thereby notifying the jury that the court's prior instructions continued to have force. During the trial, when explaining the burden of proof for a prior domestic violence incident, the trial court distinguished the preponderance of evidence standard and stated, "That does not change the burden of proof that the district attorney must

prove each charge beyond a reasonable doubt." The trial court also prefaced its final instructions with, "I will now instruct you on the rest of the law that may apply to this case," thereby affirming its prior instructions on the burden of proof. In accordance with *Aranda*, the trial court here did not indicate that its prior instructions on reasonable doubt did not apply and even included the standard reasonable doubt instruction in the written instructions. (See *Aranda, supra*, 55 Cal.4th at p. 373 [nothing in trial court's final instructions would have led the jurors to believe they must ignore the court's explications of the prosecution's burden of proof given during jury selection].)

"Given the entire record in this case, and in particular the predeliberation instructions that expressly and directly connected the reasonable doubt standard to the charged murder and its lesser included offenses, including the [attempted murder and conspiracy] offense[s] of which defendant was convicted, we conclude that it is not reasonably possible that the jury would have believed that a guilty verdict on those other crimes must be based on a finding of guilt beyond a reasonable doubt but that some lesser standard of proof, or no standard at all, applied to the [other] count[s]. We can say beyond a reasonable doubt on the record before us that the jury's verdict on the [other] charge[s] must have been based on a finding of guilt beyond a reasonable doubt." (*Aranda, supra*, 55 Cal.4th at p. 373.) Therefore, any error from the trial court's failure to read the standard reasonable doubt instruction in its predeliberation instructions was harmless beyond a reasonable doubt.

> *3. Even if the trial court defining reasonable doubt during jury selection was not adequate to satisfy its obligation to define reasonable doubt, the error was harmless.*

While the trial court's predeliberation instructions on the attempted murder and conspiracy to commit murder counts may have included the presumption of innocence and the prosecutor's burden of proving the crime beyond a reasonable doubt, as in *Aranda*, the instructions did not include a definition of reasonable doubt. (See *Aranda, supra*, 55 Cal.4th at p. 374.) The court's omission of a definition of reasonable doubt is not a violation of federal law but it does constitute an error under state law. (*Ibid.*) Nonetheless, having reviewed the record in accordance with the standard in *People v. Watson, supra*, 46 Cal.2d 818 for state law error, we conclude that there is no reasonable probability that the outcome would have been more favorable for defendant had the court provided in its predeliberation instructions a definition of the reasonable doubt standard of proof. (See *Aranda*, at p. 375.)

Nothing in the record suggests that the jury might have been confused regarding the meaning of reasonable doubt. (See *Aranda, supra*, 55 Cal.4th at p. 375.) In *Aranda*, the Supreme Court noted that the jury sent several notes requesting testimony and asking questions, but "the jury did not request clarification of the reasonable doubt principle 'as it surely would have done had it been confused as to the meaning of [that term].'" (*Ibid.*) Additionally, nothing in counsels' arguments invited the jury to apply a standard of proof less than beyond a reasonable doubt, or no standard at all. (See *ibid.*) In fact, the prosecutor addressed each element of each offense separately and after describing the evidence applicable to each element, concluded with a statement that the element had been proven "beyond a reasonable doubt," followed by a statement that the offense had been proven beyond a reasonable doubt. Defense counsel also discussed the definition of reasonable doubt using the language from CALCRIM No. 103, and the prosecutor then addressed his burden of proving the evidence beyond a reasonable doubt in

his rebuttal argument.

In *Aranda*, our Supreme Court found that the jury's acquittal of the defendant for a greater offense and conviction on a lesser offense "further suggest[ed] that the jury understood the prosecution's heavy burden of proving guilt beyond a reasonable doubt" and the prosecution "failed to carry its burden of proof as to the greater offense." (*Aranda, supra,* 55 Cal.4th at p. 376.) In this case, the jury had a question as to the elements of criminal threat, received clarification that all six elements must be proven beyond a reasonable doubt, but could not a reach verdict on that charge, which suggests that at least one juror did not believe that the prosecutor had met his heavy burden.

Finally, "[w]e can infer moreover that the jury was not left to guess as to the meaning of reasonable doubt because, as already noted, the record shows the court gave the definition when it read [CALCRIM No. 103] to the entire panel of prospective jurors," and counsel repeatedly discussed the standard during jury selection. (*Aranda, supra,* 55 Cal.4th at p. 376.) "Although not sufficient in itself to relieve the trial court of its obligation to define reasonable doubt for the sworn jurors during trial ..., the court's remarks to prospective jurors can inform the harmless error analysis and further add some support to our conclusion that there is no reasonable probability that defendant would have obtained a more favorable outcome had the court included the standard reasonable doubt instruction or otherwise defined reasonable doubt during its predeliberation instructions to the jury." (*Ibid*.) Moreover, in this case, the trial court reminded the jury of the reasonable doubt instruction before opening statements and also provided written instructions to each juror during deliberations that included CALCRIM No. 103 and its definition of reasonable doubt.

Therefore, we conclude that there is no reasonable probability that the outcome of this trial would have been more favorable to defendant had the trial court defined the reasonable doubt standard of proof in its predeliberation instructions.

Diaz, 2023 WL 5493813, at *4–14.

### a.     Legal Standard

The failure to instruct the jury on the presumption of innocence may violate the Due Process Clause of the Fourteenth Amendment, even when a proper instruction on the burden of proving guilt beyond a reasonable doubt has been given. Middleton v. McNeil, 541 U.S. 433, 437 (2004); Taylor v. Kentucky, 436 U.S. 478, 485-86 (1978).  However, the Supreme Court has held that the omission of a presumption of innocence instruction altogether does not in and of itself violate the Constitution. Kentucky v. Whorton, 441 U.S. 786, 789 (1979). Rather, "[s]uch a failure must be evaluated in light of the totality of the circumstances—including all the instructions to the jury, the arguments of counsel, whether the weight of the evidence was overwhelming, and other relevant factors—to determine whether the defendant received a constitutionally fair trial." Id.  In addition, the Supreme Court has held that "[t]he beyond a

20

1    reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits

2    trial courts from defining reasonable doubt nor requires them to do so as a matter of course."

3    Victor v. Nebraska, 511 U.S. 1, 5 (1994).  Further, there is no requirement that "any particular

4    form of words be used in advising the jury of the government's burden of proof" so long as

5    "taken as a whole, the instructions [ . . .] correctly convey the concept of reasonable doubt to the

6    jury." Id. at 5.

7           Here, Petitioner does not claim that the trial court provided an incorrect definition of

8    reasonable doubt.  He instead contends that the trial court failed to provide a complete definition,

9    and the other instructions provided were either incomplete or misleading.  He claims the trial

10   court erred by failing to instruct the jury with CALCRIM No. 220 prior to deliberations.

11   To the extent that Petitioner contends the trial court erred by failing to instruct *specifically* with

12   CALCRIM No. 220, there is no constitutional error, since Victor instructs that no specific

13   verbiage is required. Victor, 511 U.S. at 5.

14          As to Petitioner's claim that the trial court did not adequately instruct on reasonable doubt,

15   the totality of circumstances demonstrates that no constitutional error occurred. The jury was

16   accurately instructed regarding the presumption of innocence and the definition of "beyond a

17   reasonable doubt" throughout the trial.  As thoroughly discussed by the appellate court, the trial

18   court read and explained CALCRIM No. 103[7] during empanelment to the entire prospective jury

19   _____

20   [7] CALCRIM No. 103, as included in the written packet of jury instructions, provides:

21       I will now explain the presumption of innocence and the People's burden of proof. The defendants
         have pleaded not guilty to the charges. The fact that a criminal charge has been filed against the
22       defendants is not evidence that the charge is true. You must not be biased against the defendants
         just because they have been arrested, charged with a crime, or brought to trial.

23
         A defendant in a criminal case is presumed to be innocent. This presumption requires that the
24       People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must
         prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell
25       you otherwise.

26       Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the
         charge is true. The evidence need not eliminate all possible doubt because everything in life is
27       open to some possible or imaginary doubt.

28       In deciding whether the People have proved their case beyond a reasonable doubt, you must

panel.  (Doc. 14-25 at 201-03.)  The prosecution noted and discussed its burden during voir dire.

(Doc. 14-25 at 124, 127-28.)  Defense counsel also reiterated the burden on the prosecution

during empanelment.  (Doc. 14-25 at 151, 160-61.)  Prior to closing arguments, the court

repeatedly instructed the jury that the prosecution had the burden of proving beyond a reasonable

doubt that the defendant committed the crime. (Doc. 14-21 at 14, 19, 26, 29-30, 32-33, 38-40, 44,

51-52.)  Defense counsel also reminded the jury during closing arguments of the prosecution's

burden of proof. (Doc. 14-21 at 115, 118-119.)  Defense counsel stated that the prosecution's

burden of proof of beyond a reasonable doubt is:

> …even greater than clear and convincing evidence, the standard used in family
> courts when they want to take kids away from parents who have been negligent. It
> is an abiding conviction. In other words, there is no doubt in your mind that what
> took place on October 20, 2019, is that [Petitioner], in fact, engaged in all or some
> of those counts that the Government is alleging.

(Doc. 14-21 at 119.)

The packet of written instructions provided to the jurors for its deliberations included

CALCRIM No. 103, which described the presumption of innocence and reasonable doubt. (Doc.

14-3 at 134.)  This instruction accurately informed the jury that the prosecution had the burden to

prove beyond a reasonable doubt that Petitioner had committed a crime, and that they needed to

find the various elements of the substantive crimes and the special allegations beyond a

reasonable doubt.  The appellate court further noted that the jury was repeatedly reminded of the

burden of proof beyond a reasonable doubt in various instructions including, *inter alia*,

CALCRIM Nos.: 359 (jury instructed that defendant may not be convicted unless the prosecution

has proved his guilt beyond a reasonable doubt); 361 (concerning adverse testimony, jury

reminded the prosecution must still prove defendant guilty beyond a reasonable doubt); 420

(requiring proof beyond a reasonable doubt that defendant did not withdraw from conspiracy

before an overt act was committed); 505 (requiring proof beyond a reasonable doubt that

---

> impartially compare and consider all the evidence that was received throughout the entire trial.
> Unless the evidence proves the defendants guilty beyond a reasonable doubt, they are entitled to
> an acquittal and you must find them not guilty.

(Doc. 14-3 at 134.)

1  attempted killing was not justified); 521 (requiring proof beyond a reasonable doubt that the

2  killing was first degree murder rather than a lesser crime): 601 (requiring proof beyond a

3  reasonable doubt that attempted murder was committed willfully, and with deliberation and

4  premeditation); 603 (requiring proof beyond a reasonable doubt that the defendant attempted to

5  kill someone and was not acting in heat of passion); 604 (requiring proof beyond a reasonable

6  doubt that defendant was not acting in imperfect self-defense); 1701 (requiring proof beyond a

7  reasonable doubt that the burglary was first degree rather than a lesser crime).  (Doc. 14-3 at 160,

8  161, 171, 173, 177, 182-84.)

9       Despite the numerous instructions on the presumption of innocence and the burden of

10  proof noted above, Petitioner contends that the failure to specifically instruct on CALCRIM No.

11  220 could have confused the jury when considering other instructions that did not reference the

12  reasonable doubt standard.  He notes the instructions on conspiracy and burglary did not reiterate

13  the reasonable doubt requirement.  Petitioner also points to the instruction on uncharged domestic

14  violence misconduct which referenced a preponderance of evidence standard.

15       As the state court reasonably concluded, there is no reasonable possibility that the jury

16  failed to apply the reasonable doubt standard to any of the charges.  Among other instances, as

17  noted above, the reasonable doubt standard was referenced in the attempted murder and

18  conspiracy charges, as well as in the burglary, witness and corpus delicti instructions.  Although

19  the preponderance of evidence burden was referenced with respect to the uncharged domestic

20  violence, the court distinguished this particular burden of proof and instructed: "That does not

21  change the burden of proof that the district attorney must prove each charge beyond a reasonable

22  doubt." (Doc. 14-30 at 22.)  Indeed, the instruction on uncharged domestic violence (CALCRIM

23  No. 852A) specifically stated that the burden only related to that evidence: "It is not sufficient by

24  itself to prove that the defendant is guilty of Counts 1-7. The People must still prove each charge

25  and allegation beyond a reasonable doubt." (Doc. 14-3 at 189.)  A fairminded jurist could

26  certainly conclude that there was no confusion on the burden of proof such that Petitioner could

27  have been found guilty on a lesser burden of proof.

28

Based on the foregoing, a fairminded jurist could conclude that the jury was adequately instructed on the presumption of innocence and the burden of proof beyond a reasonable doubt. Petitioner fails to demonstrate that the state court rejection of his claim was contrary to, or an unreasonable application of, Supreme Court authority; nor does Petitioner show that the state court's factual findings were unreasonable.  The petition should be denied.

**IV.    RECOMMENDATION**

Based on the foregoing, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus be DENIED with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be served and filed within fourteen (14) court days (plus three days if served by mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).  This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment.

IT IS SO ORDERED.

Dated:   __May 16, 2024__                        ____*/s/ Sheila K. Oberto*_____
                                                      UNITED STATES MAGISTRATE JUDGE